# In re ORFA CORP. OF PHILADELPHIA, Orfa Corp. of America, Orfa Corp. of America (Del.), Debtors.

Civ. A. No. 93–4038.
Bankruptcy Nos. 90–11253S to 90–11255S.

United States District Court,
E.D. Pennsylvania.

April 26, 1994.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for appellant Bank of America, N.T. & S.A.

Frederic J. Baker, U.S. Trustee, Philadelphia, PA.

Stephen Raslavich, Silberman, Markovitz & Raslavich, Philadelphia, PA, for Robert Taylor, Chapter 11 Trustee.

Robert Taylor, Chapter 11 Trustee, Plymouth Meeting, PA.

### MEMORANDUM AND ORDER

YOHN, District Judge.

Presently before the court is an appeal from an order of the bankruptcy court allowing Robert Taylor, the Chapter 11 Trustee in the underlying bankruptcy cases, and his counsel, the law firm of Silberman, Markovitz & Raslavich ("SMR"), to recover $82,500 from Bank of America ("BOA")[1] as compen-

---

1. BOA is the successor-in-interest to Security Pacific National Bank ("SPNB"), the primary se-

cured creditor of the Debtors. Hereinafter,

sation for their services pursuant to 11 U.S.C. § 506(c). For the reasons set forth herein, the court will vacate this order and remand the matter to the bankruptcy court for further proceedings consistent with this memorandum.

## I.

The saga encompassing the instant appeal began on March 20, 1990 when Orfa Corp. of America ("OrfaAm"), Orfa Corp. of Philadelphia ("OrfaPhil"), and Orfa Corp. of America (Del.) ("OrfaDel") (hereinafter collectively referred to as "Orfa" or "the Debtors") filed three related voluntary Chapter 11 bankruptcy cases.[2] At the time of the filings, OrfaPhil was the owner of a waste processing plant located in Philadelphia ("the Property"), OrfaDel was the licensor of an alleged environmentally-advanced technology for recycling solid waste known as the Orfa process ("the Licenses"), and OrfaAm was the parent corporation which managed OrfaPhil and OrfaDel. *Orfa V* at 791–92. The Bank was the primary secured creditor of the Debtors. The debt was secured by a lien on the Property from OrfaPhil and by certain other assets of the Debtors, notably a guarantee from OrfaDel secured by the Licenses. *Id.*

On May 22, 1990, the Bank filed a motion requesting relief from the automatic stay to permit it to foreclose on the Property. (*See* Record, Ex. 19.)[3] The hearing on this motion was continued to a later date as of June 25, 1990, when the Official Unsecured Creditors' Committee of the Debtors ("the Committee") filed a motion seeking the appointment of a Chapter 11 Liquidating Trustee or alternatively the conversion of the cases to a Chapter 7 proceeding ("the Trustee Motion"). (*See* Record, Ex. 20.) On July 6, 1990, the Bank filed a Joinder to the Trustee

Motion ("the Joinder"). (*See* Record, Ex. 21.) On July 20, 1990, following a hearing conducted the previous day, the bankruptcy court granted the Trustee Motion, although it deleted the term "liquidating" from the proposed order appointing the trustee and declined to convert the cases to Chapter 7. (*See* Record, Ex. 22; *Orfa V* at 792.) On August 9, 1990, Robert Taylor was appointed the Chapter 11 Trustee, *see Orfa V* at 792, and SMR filed a successful application for appointment as the Trustee's counsel on August 17, 1990. *Id.*

Taylor's initial decision was to liquidate the Debtors by agreeing to allow the Bank to foreclose on the Property and by selling the Licenses to Bruce Energy Center, Inc. ("BEC") for $3 million to use as a basis for forming a competing waste-disposal plan. *Id.* He reconsidered his initial position, however, in light of a proposal presented by a group of former investors in the Debtor ("the Plan Proponents") to prepare a plan of reorganization that would allow the Debtors to repair and successfully operate the plant under the Licenses. *Id.* Thereafter, the bankruptcy court, noting Taylor's ambivalence regarding his own motion to sell the Licenses, denied that motion, BEC lost interest in the cases, and Taylor supported, albeit with some reservations, the Plan Proponents' efforts to reorganize the Debtors. *Id.* The Bank then became the isolated opponent of the Plan Proponents' reorganization efforts and, after the bankruptcy court confirmed a reorganization plan, it embarked upon a strategy of filing a series of renewed motions seeking either relief from the stay or conversion of the cases to Chapter 7. *Id.* at 792–93.

The genesis of the instant appeal occurred on May 4, 1992 when SMR filed its First

---

SPNB and BOA are collectively referred to as "the Bank."

**2.** These cases have spawned no less than five published opinions. The bankruptcy court's initial opinion on the matter now before this court on appeal is reported at 149 B.R. 790 (Bankr. E.D.Pa.1993) and is cited herein as *Orfa V.* Background on the contentious and complex history of the underlying bankruptcy cases may be found at 115 B.R. 799 (Bankr.E.D.Pa.1990) (*Orfa I*), 121 B.R. 294 (Bankr.E.D.Pa.1990) (*Orfa II*), 129 B.R. 404 (Bankr.E.D.Pa.1991) (*Orfa III*),

and 1991 WL 225985 (Bankr.E.D.Pa.1991) (*Orfa IV*).

**3.** Pursuant to § 362(a) of the Bankruptcy Code, "the filing of a bankruptcy petition under Chapter 11 generally results in the imposition of an automatic stay of judicial proceedings, including state foreclosure actions." *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 697 (3d Cir.1989). Pursuant to § 362(d), an interested party "may request the bankruptcy court to grant it relief from the automatic stay by nullifying, terminating, modifying, or conditioning the stay." *Id.*

Interim Application for Compensation and Reimbursement of Expenses ("the First Fee Application") seeking compensation of $177,367.50 for fees and $2,156.89 for costs for the period from July 17, 1990 to March 31, 1992. (*See* Record, Ex. 31.) After a hearing on the Bank's objections, the bankruptcy court allowed a reduced sum of $160,730.39 but prohibited payment until distribution was accomplished under the confirmed plan.[4] Thereafter, on August 12, 1992, Taylor filed a Motion to Compel Secured Creditor to Pay Administrative Expenses, (*see* Record, Ex. 32), seeking to compel the Bank to pay him whatever statutory commissions he might be granted pursuant to 11 U.S.C. § 326(a) and to pay SMR the $160,730.39 previously awarded plus whatever additional sums they might be awarded. The motion was based upon 11 U.S.C. § 506(c) (hereinafter the motion is referred to as "the 506(c) Motion") which provides as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

On September 24, 1992 the bankruptcy court converted the cases to Chapter 7 cases, *see Orfa V* at 793, and appointed Christine Shubert, Esquire, as the Chapter 7 Trustee on October 6, 1992. *Id.* On December 2, 1992, the bankruptcy court denied both the Plan Proponents' motion to reconsider the conversion order and the Bank's motion to dismiss the 506(c) Motion, and began to take testimony on the 506(c) Motion. *See Orfa V* at 794. Following a continued hearing on the 506(c) Motion, the bankruptcy court issued an Opinion and Order on January 22, 1993 ("the Preliminary Order" or "*Orfa V*").

In the Preliminary Order, the bankruptcy court held that it was unclear whether Taylor was entitled to any commissions under 11 U.S.C. § 326(a) and that until he justified his claim to such commissions under the applicable guidelines the quantification of any award to him was impossible. *Orfa V* at 797. Moreover, the bankruptcy court held that in order to receive compensation pursuant to § 506(c) both Taylor and SMR had to satisfy either an "objective" or a "subjective" test. *Id.* at 798–801. The objective test required Taylor and SMR to demonstrate that the services for which they claimed compensation benefitted the Bank's secured property. *Id.* at 798.

The subjective test focused upon the Bank's alleged consent to the services performed by Taylor and SMR. Under that theory of recovery, a secured creditor such as the Bank could not "call upon a professional to perform services on its behalf, and then deny payment ... because hindsight proves that the services did not provide the anticipated benefit." *Id.* at 799. Nevertheless, the bankruptcy court rejected "[Taylor's] contention that [the bankruptcy court] focus solely upon [the Bank's] consent to his appointment [the Joinder] as a basis for allowing all of the sums requested, even those arising from actions which were directly opposed by [the Bank] and which he has not proven benefitted its interest." *Id.* at 791. The bankruptcy court noted that the Bank's disapproval of Taylor's actions began a mere three weeks after his appointment and that this disapproval was "clearly manifested as to most of [Taylor's] actions by the time that the Plan Proponents filed their plan on September 28, 1990." *Id.* at 799. Accordingly, neither "general administrative services during the periods of an adversarial relationship between [Taylor] and [the Bank]" nor "[a]ppearances at which [Taylor], either expressly or by clear implication, supported the Plan Proponents against [the Bank]" satisfied the "subjective test" under § 506(c) and were thus not compensable. *Id.* at 800. Only those services to which the Bank specifically consented were compensable under § 506(c). *Id.* at 791, 797, 801.

---

**4.** The confirmed plan never became effective due to the failure of the Plan Proponents to obtain the necessary financing package. *See Orfa V* at 793. The bankruptcy court attributed this result at least in part to the Bank's "scorched earth" litigation tactics. *Id.* at 800. This court concurs in the bankruptcy court's observation that those "scorched earth" tactics were "excessive and grossly wasteful to the time resources of the court and the financial resources of all involved...." *Id.*

Noting that it was impossible on the record before it at that time to conclude whether either the objective or the subjective test had been satisfied, the bankruptcy court ordered Taylor to file a request for commissions ("the Trustee Application") and for SMR to file a fee application ("the Second Fee Application) covering the period from April 1, 1992 to October 6, 1992—the date when the Chapter 7 Trustee was appointed. *Id.* at 791, 797, 800–01. The bankruptcy court directed Taylor and SMR to designate on both the Trustee Application and the Second Fee Application as well as on the previously granted First Fee Application precisely which services they contended directly benefitted the Bank and/or were allegedly consented to by the Bank. *Id.* Moreover, they were ordered to briefly explain the basis of their contentions as to each entry for which compensation from the Bank was claimed and to specify the amount sought. *Id.* at 797, 801.

On May 11, 1993, after Taylor and SMR had submitted their respective applications and the Bank had responded thereto, but before the bankruptcy court had ruled on the 506(c) Motion, the bankruptcy court dismissed the underlying bankruptcy cases upon the motion of the Chapter 7 Trustee. (*See* Record, Ex. 7.) This dismissal prompted the Bank to argue that the bankruptcy court no longer retained jurisdiction over the 506(c) Motion. (*See* Record, Ex. 47.) Taylor and SMR, in addition to disputing the Bank's position regarding jurisdiction, (*see* Record, Ex. 46), moved the bankruptcy court to reconsider its dismissal order. (*See* Record, Ex. 45.)

On June 18, 1993, the bankruptcy court issued an order ("the Final Order") wherein it denied the reconsideration motion but ruled that it nonetheless retained jurisdiction over the 506(c) Motion. (*See* Record, Ex. 2 at ¶ 1.) In the Final Order, the bankruptcy court ruled that Taylor and SMR were entitled to recover the reduced sum of $82,500 for their services directly from the Bank pursuant to § 506(c). (*Id.* at ¶ 2.) Taylor and SMR were directed to divide the amount awarded among themselves as they saw fit with the caveat that Taylor was not to receive in excess of the amount to which he was entitled pursuant to 11 U.S.C. § 326(a). (*Id.*)

Both the Bank and Taylor/SMR have now appealed the Final Order. The Bank, in typical "scorched earth" fashion, *see supra* n. 4, challenges it on thirty factual and legal grounds, including the jurisdictional issue. Taylor and SMR (hereinafter collectively referred to as "the Appellees") challenge essentially the amount of the compensation awarded them in the Final Order, contending that they should have received the entire amount they sought. The court has jurisdiction over these appeals pursuant to 28 U.S.C. § 158(a). In an appeal from a bankruptcy court decision, the district court sits as an appellate court and has plenary review of conclusions of law, but may not set aside a bankruptcy courts's findings of fact unless they are clearly erroneous. *See Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 100 (3d Cir.1988).

## II.

The court must first address the threshold issue of whether the bankruptcy court properly exercised jurisdiction over the 506(c) Motion. The Bank offers two theories in support of its contention that the bankruptcy court lacked jurisdiction.[5] First, the Bank contends that on two occasions in January and February of 1992, prior to the filing of the 506(c) Motion, it obtained relief from

---

5. In its reply brief, the Bank argues for the first time that the bankruptcy court lacked jurisdiction over the 506(c) Motion because, pursuant to Local Rule 2 of the Eastern District of Pennsylvania, the standing order upon which the bankruptcy courts in this district had relied for jurisdiction, *see In re Malone,* 74 B.R. 315, 318 (Bankr. E.D.Pa.1987); *Raff v. Gordon,* 58 B.R. 988, 991 n. 5 (E.D.Pa.1986), was repealed effective May 31, 1990. This argument is without merit for two reasons.

First, the underlying bankruptcy cases were filed prior to May 31, 1990—the effective date of the repeal. And second, on November 8, 1990, this district issued an Order of Reference which amended the order purportedly repealed by Local Rule 2 and again provided for bankruptcy court jurisdiction. *See also In re Philadelphia Training Center Corp.,* 155 B.R. 109, 110 (E.D.Pa. 1993) ("In this district, cases or proceedings arising under the Bankruptcy Code are referred automatically to the Bankruptcy Court").

the automatic stay imposed by 11 U.S.C. § 362. According to the Bank, "[r]elief from stay results in dismissal for lack of jurisdiction because once obtained, relief from stay terminated the Bankruptcy Court's jurisdiction over the Bank's collateral, the property otherwise sought to be charged under § 506(c)." (Appellant's Br. at 12.) And second, the Bank contends that the bankruptcy court had no authority to retain jurisdiction over the 506(c) Motion after it dismissed the underlying bankruptcy cases. These contentions are discussed in turn below.

### A.

The Bank first argues that pursuant to 28 U.S.C. § 362(e), the automatic stay automatically expired in January, 1992 when the bankruptcy court failed to hold a preliminary hearing within thirty (30) days after the Bank had filed a request for relief from the automatic stay ("the Bank's Motion").[6] After a secured creditor requests a bankruptcy court to grant it relief from an automatic stay pursuant to 11 U.S.C. § 362(d), "[s]ection 362(e) and Bankruptcy Rule 4001(a)(2) create a specific schedule, comprised of three thirty-day periods, which governs the timing of hearings and rulings respecting the continuation of the automatic stay." *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 697 (3d Cir.1989). The Third Circuit in *Wedgewood* described that schedule as follows:

> First, in accordance with the provisions of section 362(e), the court must hold a hearing concerning the status of the stay within thirty days after a request for relief from the stay is filed. Second, if that hearing is merely a preliminary hearing, then the court must issue a preliminary ruling at the conclusion of the hearing continuing the stay if there is a reasonable likelihood that the nonmovant will ultimately prevail, and must schedule a final hearing to be held within thirty days of the conclusion of the preliminary hearing. Failure either (1) *to hold a hearing within thirty days of the filing of the request for relief,* or (2) to

issue an order continuing the stay and to schedule a final hearing within thirty days of the preliminary hearing, *results in automatic termination of the stay.* Bankruptcy Rule 4001(a)(2) provides the final thirty-day time period. Under that rule, the court must issue either an order continuing the stay pending its final decision or a final decision within thirty days after commencement of the final hearing.[7]

*Id.* at 697–98 (emphasis added); *see also Borg–Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir.1982) (chart illustrating the timetable created by § 362(e) and former Bankruptcy Rule 4001(a)(2)). The Third Circuit has referred to the time constraints imposed by § 362(e) as "stringent" and as "an essential underpinning to the automatic stay provisions of the Code." *Wedgewood*, 878 F.2d at 698.

In this instance, despite the passage of more than thirty days between the filing of the Bank's Motion and the initial hearing thereupon, the bankruptcy court ruled that the automatic stay nevertheless did not automatically terminate because strict application of *Wedgewood*'s holding was precluded by the Bank's failure to properly serve its Motion and accompanying notice of hearing pursuant to Federal Rule of Bankruptcy Procedure 9014 and Local Bankruptcy Rule ("L.B.R.") 9014.1(c)(1). (*See* Record, Ex. 25 at 2.) Before evaluating the bankruptcy court's ruling, a review of the local bankruptcy rules regarding service, particularly as they pertain to the specific circumstances surrounding the filing the Bank's Motion, is in order.

Pursuant to L.B.R. 9014.1(b)(2) all motions must be accompanied by a proposed Order Requiring Answer and Notice of Hearing to Consider Motion ("the Order"). *See* Local Bankruptcy Form ("L.B.F.") 9014.1A. Pursuant to L.B.R. 9014.1(c)(1) a movant must serve a copy of its motion along with the Order upon all interested persons within

---

**6.** The Bank filed its Motion on December 19, 1991, (*see* Record, Ex. 23) and a hearing thereupon was held on January 22, 1992, (*see* Record, Ex. 11)—thirty-four (34) days after the Motion was filed.

**7.** Rule 4001(a)(2) has since been deleted, *see In re SeSide Co., Ltd.*, 155 B.R. 112, 115 (E.D.Pa. 1993), but the initial thirty-day time constraint imposed by § 362(e) remains in effect.

three (3) business days of receipt from the clerk of the completed notice. In this instance, the Bank never served the other parties with the completed notice that had scheduled a hearing on the Bank's Motion for January 22, 1992. The Bank contends that it never received the completed Order from the clerks' office, but rather first learned of the hearing two days prior to its scheduled date.[8] (Appellant's Reply Br. at 19–20.) According to the Bank, it then immediately notified all interested persons via fax. (*Id.*) It also contends that it served all interested parties, including Taylor and SMR, with a copy of its Motion on December 19, 1991 simultaneously with the Motion's filing. (*See* Record, Exhibit 23 at ¶ 20.)[9]

At the hearing on January 22, 1992, the Bank, despite its failure to properly serve the other parties with notice of the scheduled hearing,[10] took the position that the stay had automatically terminated by virtue of § 362(e) because more than thirty days had passed since its Motion had been filed. The bankruptcy court, in an order issued the next day, rejected that position. According to the bankruptcy court, in a situation where the party seeking relief has failed to properly provide notice of the scheduled hearing to interested parties, to allow the automatic termination of the stay would deprive those parties of due process of law. (*See* Record, Ex. 25 at 2.) Thus, the bankruptcy court ordered that the automatic stay would remain in effect pending a continued hearing on the Bank's Motion on February 5, 1992. (*Id.* at 1–2.) Following that continued hearing, on February 6, 1992 the bankruptcy court ordered that "[t]he automatic stay shall remain in effect on the condition that the Plan Proponents post the sum of $25,000 with the Trustee ... on or before February 19, 1992." (Record, Ex. 26 at ¶ 1.)

While the court agrees with the bankruptcy court's ultimate determination that the automatic stay did not automatically terminate thirty days after the Bank's Motion was filed, it cannot follow the reasoning employed to reach that determination for two reasons. First, the bankruptcy court's focus upon notice ignores the fact that the preliminary hearing on the Bank's motion was *scheduled* for a date more than thirty days after the Bank's motion was filed. Even if the Appellees or the other interested parties had received proper notice of the scheduled hearing, such hearing would nonetheless have been scheduled to occur after the thirty-day limit had expired.[11] And second, the bank-

---

8. The bankruptcy court docket reveals that the clerk's office set the hearing date on the Bank's Motion on December 31, 1991. (*See* bankruptcy docket # 598). The normal procedure of the clerk's office is to mail to the movant—in this instance the Bank—a notice of the scheduled hearing on the same day that such hearing is set.

9. At the hearing conducted on January 22, 1992, SMR essentially conceded that it had been served with the Bank's Motion or at least was aware that it had been filed, (*see* Record, Ex. 11 at 3, 7), and indeed the Plan Proponents actually filed an answer to the Bank's Motion on December 30, 1991, (*see* Record, Ex. 24)—one day before the clerk's office had even completed the notice of hearing. *See supra* n. 8.

10. At the hearing, the Bank argued that since it is the *receipt* of the completed notice of hearing from the clerk's office that triggers the service requirement of L.B.R. 9014.1(c)(1), the Bank did not fail to comply with the Rule because it never received a completed notice from the clerk's office. The bankruptcy court apparently rejected this argument, noting that a mailing by the clerk's office carried a presumption that the mailed document was received. (*See* Record, Ex. 11 at 5, 9.)

11. Of course, had the Appellees or the other interested parties received proper notice earlier, they might have attempted to bring the issue of the automatic termination of the stay to the bankruptcy court's attention and might possibly have received an expedited hearing to comply with the deadline. Nevertheless, despite the Appellees' contention that they were not aware of the scheduled hearing until January 20, 1992, they apparently knew that the Bank's Motion had been filed on December 19, 1991. (Record, Ex. 11 at 3, 7.) That knowledge might conceivably have put them on notice that the thirty-day time limit had begun to run. Whether this imposed upon them an affirmative duty to discover the scheduled hearing date to ensure that it fell within the time limit is debatable. *Compare In re River Hills Apartments Fund*, 813 F.2d 702, 707 (5th Cir.1987) ("it is the debtor's burden to call the issue [of the bankruptcy court's duty to act within the appropriate time limit] to the court's attention if it desires that the stay be continued") (footnote omitted) *with In re Clark*, 69 B.R. 885, 892 ("if the Clerk's Office fails to schedule a hearing on a § 362 Motion promptly, the burden is placed upon the creditor to see that this is done rather than ... the debtor"), *modified on other grounds*, 71 B.R. 747 (Bankr.E.D.Pa.1987).

ruptcy court's reliance upon one of its earlier decisions—*In re Clark*, 69 B.R. 885, 892, *modified on other grounds*, 71 B.R. 747 (Bankr.E.D.Pa.1987)—is misplaced. The holding in that case is contrary to prevailing precedent and to a certain extent directly contradicted by the Third Circuit's later ruling in *Wedgewood*.

In *In re Clark*, as in the instant case, a hearing on a creditor's motion for relief from the automatic stay was neither scheduled by the clerk's office nor conducted until more than thirty days after the filing of the motion, although there it appears as though the interested parties received proper and timely notice of the scheduled hearing date. *In re Clark*, 69 B.R. at 888. There, the bankruptcy court reasoned that a debtor could not be deprived of such an important property right as the automatic stay without due process.[12] Instead, it is "only after the debtor is accorded notice and given an opportunity for a hearing ... [that] the thirty-day period ... begin[s] to run." *Id.* at 892. Accordingly, "the failure of our Clerk's Office to schedule the hearing ... until a date slightly beyond the thirty-day period after the Movant's Motion was filed did not result in termination of the stay." *Id.* at 893.

The first component of the holding in *In re Clark*—that the first thirty-day period of § 362(e) begins to run only after interested parties are afforded an opportunity for a hearing—is clearly no longer valid after *Wedgewood*. There, the Third Circuit was clear that the operative event that triggers the running of the first thirty-day period under § 362(e) is the filing of a motion for relief from the stay. *See Wedgewood*, 878 F.2d at 697. The second component—that "a lapse of the thirty-day period set forth in 11

U.S.C. § 362(e) arising solely to the failure of the Clerk's Office to list the matter for a hearing in timely fashion" cannot "effect an automatic termination of an automatic stay," *In re Clark*, 69 B.R. at 888—is not directly contradicted by *Wedgewood*, but is nonetheless contrary to other precedents.

In *In re Jones*, 89 B.R. 1 (Bankr.D.D.C. 1988), the court held that the automatic stay expired per § 362(e) even though the failure to schedule a preliminary hearing within the initial thirty-day period was inadvertent and neither party objected to the preliminary hearing date. *Id.* The court noted *In re Clark*'s contrary conclusion, but decided to follow other precedents including *In re River Hills Apartments Fund*, 813 F.2d 702, 707 (5th Cir.1987) (automatic stay terminates even if court's failure to hold a hearing is due to its own inadvertence) (footnote omitted), and *In re Looney*, 823 F.2d 788, 792 (4th Cir.) (Legislative history makes it clear that § 362(e) "was enacted to prevent the practice under the old Bankruptcy Act of 'injunction by continuance'" and unequivocally states that "[i]f the court does not rule within 30 days from a request by motion for relief from the stay, the stay is automatically terminated with respect to the property in question") (citation omitted), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

The seemingly harsh result sanctioned by *In re Jones, In re River Hills Apartments Fund*, and *In re Looney* (among other cases) is tempered by their recognition that a bankruptcy court has authority to reimpose a stay that has automatically terminated per § 362(e) by virtue of its injunctive powers pursuant to 11 U.S.C. § 105(a).[13] In full, § 105(a) provides that:

> [E]ven if the automatic stay can be said to have terminated "only because of the court's inability to administer its heavy caseload within the time constraints set out under section 362(e) of the Code," the stay could be promptly reinstated on the strength of 11 U.S.C. § 105(a) of the Code. *In re Brusich & St. Pedro Jewelers, Inc.*, 28 B.R. 545, 549 (Bankr.E.D.Pa.1983).

*In re Clark*, 69 B.R. at 892–893 (other citations omitted).

---

**12.** Implicit in the due process rationale is the premise that the automatic stay is the type of property right protected by the Fifth and Fourteenth Amendments. Because the court does not endorse the bankruptcy court's due process rationale, it expresses no opinion as to whether the automatic stay, a creation of Congress, is indeed a such a property right.

**13.** Indeed, even in *In re Clark*, the bankruptcy court admitted that while the result reached was consistent with other cases, those other cases had reached their results by invoking § 105(a):

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

■ In *Wedgewood*, the Third Circuit held that a bankruptcy court may exercise its injunctive powers pursuant to 11 U.S.C. § 105(a) to reimpose a stay which has automatically terminated pursuant to § 362(e) due to the inadvertence of the court. 878 F.2d at 699–702. "The relief [available] under section 105(a), however, is neither automatic nor may it be imposed sua sponte by the court." *Id.* at 701. In order to qualify for the relief available under § 105(a), the movant must properly apply for such injunctive relief in accordance with the procedures set forth in Bankruptcy Rule 7065 and Federal Rule of Civil Procedure 65 and must satisfy the applicable standards for injunctive relief. *Id.* at 700–01.

Thus, the bankruptcy court's due process rationale, as intuitively logical and reasonable as it may be, cannot be squared with *Wedgewood* and the other cases discussed above. Based upon those cases, the court concludes that an inadvertent failure to hold a preliminary hearing within thirty days from the filing of a motion seeking relief from the stay automatically terminates the automatic stay per § 362(e) although the bankruptcy court, upon proper application and satisfaction of applicable standards, may reimpose the stay pursuant to its injunctive powers under § 105(a).

■ The obvious problem in this instance is that neither the Appellees nor any other interested party such as the Plan Proponents ever sought or obtained an injunction under § 105(a). Clearly, they had no reason to seek the reimposition of the stay in light of the bankruptcy court's prompt ruling that the stay had not automatically terminated by operation of § 362(e). To hold now that the bankruptcy court erred when it ruled that the automatic stay had not terminated clearly prejudices the Appellees because it in effect retroactively deprives them of the opportunity to seek an injunction which they probably would have been granted.[14] In *Wedgewood*, the Third Circuit vacated the bankruptcy court's order ruling that the automatic stay had not terminated pursuant to § 362(e) but did so without prejudice to "the right of the debtor to apply for relief to the bankruptcy court under section 105(a)." 878 F.2d at 702. Here, however, where the underlying bankruptcy case has since been dismissed and there is consequently no longer any stay to reimpose, that option is not possible.

Nevertheless, some courts have crafted what might be termed an "equitable exception" to the time constraints of § 362(e). Under this principle, an implied waiver may be found where "the creditor takes some action which is inherently inconsistent with adherence to the time constraints of section 362(e)." *Wedgewood*, 878 F.2d at 698–99 (citing cases). *See also In re Craghead*, 57 B.R. 366, 368 n. 4 (W.D.Mo.1985) (noting that "reported cases indicate that the mere passage of thirty days does not always operate to divest the Bankruptcy Court of jurisdiction to reinstate or continue the stay" and citing cases wherein "courts have been willing to find a 'waiver' of the thirty-day limitation").

For example, in *Borg–Warner Acceptance Corp. v. Hall*, 685 F.2d 1306 (11th Cir.1982), the Eleventh Circuit found an implied waiver where the creditor proceeded without objection to a preliminary hearing scheduled more than thirty days after it had filed its motion seeking relief from the stay. *Id.* at 1308. *See also In re SeSide Co., Ltd.*, 155 B.R. 112, 116 (E.D.Pa.1993) (implied waiver found

14. In its order ruling that the automatic stay had not terminated and continuing the hearing on the Bank's motion, the bankruptcy court noted that "there is a strong likelihood that the parties opposing [the Bank's Motion] will again prevail at this hearing." (Record, Ex. 25 at 2.) However, "the standards applied to reimpose the stay under injunctive principles are more stringent than those applied under section 362(d) to continue the stay." *Wedgewood*, 878 F.2d at 700.

where creditor agreed to briefing schedule that extended more than thirty days after its request for relief was filed); *In re Small,* 38 B.R. 143, 147 (Bankr.D.Md.1984) (implied waiver found where creditor filed discovery requests to which responses were due more than thirty days after its request for relief was filed); *In re Wilmette Partners,* 34 B.R. 958, 961 (Bankr.N.D.Ill.1983) (implied waiver found where creditor agreed to continuance of preliminary hearing beyond thirty-day time period).

■ Here, the Bank failed to properly serve the Appellees and other interested parties with its Motion and the completed notice of hearing pursuant to L.B.R. 9014.1(c)(1). Even accepting, *arguendo,* the Bank's contention that it never received a completed notice from the clerk's office, the court concludes that the Bank's failure to notify the other parties of the scheduled hearing date until after the thirty-day period had already expired constituted an implied waiver of strict adherence to that thirty-day limit. Having filed a motion for relief from stay, the Bank should have checked directly with the clerk's office to ascertain the scheduled date for the hearing. Had it done so, its notice to the other parties might have at least triggered a request by those parties to move the hearing date forward within the thirty-day limit. The purpose of § 362(e) is to protect secured creditors from the inaction of bankruptcy courts, *see Wedgewood,* 878 F.2d at 697, not to reward them for their own inaction. Consequently, the bankruptcy court did not err when it ruled that the automatic stay did not terminate by effect of § 362(e), and the Bank did not obtain relief from the automatic stay in January, 1992.

■ The Bank also contends that it obtained relief from the automatic stay on February 19, 1992 when the Plan Proponents failed to post the sum of $25,000 with Taylor in accordance with the bankruptcy court's order of February 6, 1992. (Appellant's Br. at 14.) Taylor did, in fact, receive the money on February 20, 1992.

The Bank's position is not without some merit. The bankruptcy court did condition the continuance of the stay upon the Plan Proponents posting $25,000 with Taylor by

February 19th not by February 20th. Nevertheless, the Bank never filed a renewed motion for relief from the stay contending that the Plan Proponents' slight deviation from the terms of the bankruptcy court's order entitled it to relief. Instead, the Bank filed a Certificate of Expiration of Automatic Stay, (*see* Record, Ex. 27), which the bankruptcy court termed "a unilateral assertion by [the Bank] which no court has upheld." *Orfa V,* at 796. This court agrees:

The requirement that the Plan Proponents post $25,000 with Taylor by the 19th was mandated by neither statute nor rule but rather was fashioned by the bankruptcy court pursuant to its power under § 362(d) to condition a stay. Since the bankruptcy court itself created the deadline, it would certainly seem to have been within the bankruptcy court's discretion to either permit or prohibit a slight deviation from its terms. Certainly, the Bank has offered this court no case-law to support the notion that a bankruptcy court must rigidly adhere to the terms of a condition that it itself imposed. Therefore, the bankruptcy court did not abuse its discretion by refusing to accept the Bank's contention that the automatic stay expired as a result of the Plan Proponent's one-day delay in posting the money, and the Bank did not obtain relief from the automatic stay on February 19, 1992.

■ Finally, even assuming *arguendo* that the Bank did obtain relief from the automatic stay in either January or February of 1992, the court is not convinced that obtaining such relief would necessarily have deprived the bankruptcy court of jurisdiction over the 506(c) Motion. While "granting relief from the stay as to certain property normally diminishes significantly the estate's interest in that property ... [it does not] deprive[ ] a bankruptcy court of jurisdiction over that property." *In re Fricker,* 113 B.R. 856, 864 (Bankr.E.D.Pa.1990) (*Fricker I* ). A bankruptcy court "should" decline to exercise jurisdiction in "most circumstances" but nevertheless may intervene at its discretion. *Id.* *See also In re Anderson,* 129 B.R. 44, 48 (Bankr.E.D.Pa.1991) (relief from the automatic stay as to certain property of the debt-

or *generally* eliminates the bankruptcy court's jurisdiction over contested matters relating to that property).

The Bank does not challenge the basic premise that a bankruptcy court may, in its discretion, retain jurisdiction over property as to which relief from stay has been granted. (*See* Appellant's Br. at 14–15.) Rather, the Bank argues that "[t]he standard established in [*Fricker I*] is not sufficiently certain to determine the question of jurisdiction," and instead urges this court to adopt the standard enunciated in *In re Oakes*, 129 B.R. 477 (Bankr.N.D.Ohio 1991), because "it is much clearer and easier to ascertain." (*Id.*)

Neither *Oakes* nor *Fricker I* can fairly be said to have formulated a generalized standard for bankruptcy courts to employ in determining whether or not to exercise their discretion to retain jurisdiction post-relief-from-stay. In both, the respective bankruptcy courts evaluated the instant circumstances in light of the available precedents and exercised their discretion to retain jurisdiction. Neither based its decision upon a clearly articulated standard. Indeed, none of the cases upon which both relied announced a generally applicable standard. *See In re Ridgemont Apartment Associates*, 105 B.R. 738 (Bankr.N.D.Ga.1989); *Matter of Foster*, 105 B.R. 746 (Bankr.M.D.Ga.1989); *In re Hood*, 92 B.R. 648 (Bankr.E.D.Va.), *aff'd*, 92 B.R. 656 (E.D.Va.1988).

Here, the bankruptcy court held that even if the Bank had obtained relief from the stay in January or February 1992, it nevertheless retained jurisdiction over the 506(c) Motion because "it is well-established that a creditor's obtaining relief from the automatic stay as to certain property does not in itself always eliminate bankruptcy court jurisdiction over that property." *Orfa V*, at 796 (citing *Fricker I*). As noted above, the Bank does not challenge this principle, nor has it drawn the court's attention to any cases holding that a bankruptcy court lacks jurisdiction over a 506(c) Motion once relief from stay has been granted as to the property sought to be charged under § 506(c). Thus, even if the Bank did obtain relief from the automatic stay in either January or February 1992, the bankruptcy court did not err in exercising jurisdiction over the 506(c) Motion.

**B.**

■ The Bank also contends that the bankruptcy court lacked jurisdiction over the 506(c) Motion once it dismissed the underlying bankruptcy cases on May 11, 1993. Both the Bank and the Appellees focus their arguments upon whether or not the bankruptcy court had "cause" pursuant to 11 U.S.C. § 349(b) to retain jurisdiction over the 506(c) Motion post-dismissal. Section 349(b) of the Bankruptcy Code reserves to the bankruptcy court "the power to alter the normal effects of the dismissal of a bankruptcy case if cause is shown." *In re Pocklington*, 21 B.R. 199, 202 (Bankr.S.D.Cal.1982). According to the Bank, the bankruptcy court erred when it relied upon this "narrow exception under Section 349(b)" in deciding to retain jurisdiction over the 506(c) Motion. (Appellant's Br. at 16.) The court disagrees.

The court initially notes that, although the applicability of § 349(b) as a basis for the bankruptcy court's retention of jurisdiction over the 506(c) Motion post-dismissal was apparently raised at a hearing on the matter, (*see* Record, Ex. 16), and indeed both the Bank and the Appellees submitted briefs on the issue, (*id.* at Exs. 46, 47), the bankruptcy court never explicitly relied upon § 349(b) as a basis for its decision to retain jurisdiction. Rather, in the Final Order, the bankruptcy court relied upon its earlier decision in *In re Fricker*, 131 B.R. 932 (Bankr.E.D.Pa.1991) (*Fricker II*) as the basis of its decision to retain jurisdiction over the 506(c) Motion post-dismissal. (*See* Record, Ex. 2 at ¶ 1.) Accordingly, the court sees no reason to focus upon the Bank's contention that the bankruptcy court erred by relying upon the purportedly narrow for-cause exception provided by § 349(b), where the bankruptcy court's ultimate decision to retain jurisdiction over the 506(c) Motion post-dismissal was not guided by reference to § 349(b). Thus, rather than reviewing a phantom legal conclusion never reached by the bankruptcy court, the court will instead evaluate the bankruptcy court's reliance upon *Fricker II*.

In *Fricker II*, the bankruptcy court retained jurisdiction to determine the propriety of the compensation received by the debtor's counsel although it had already dismissed the underlying bankruptcy case and that dismissal had been affirmed by the district court. *Id.*, 131 B.R. at 937–938. Other courts have reached similar results. *See Matter of Samford*, 125 B.R. 230 (E.D.Mo.1991) (district court holds that bankruptcy court properly retained jurisdiction following dismissal of case in order to determine whether postpetition attorney fees, paid without the bankruptcy court's approval, were recoverable by the estate); *Post v. Ewing*, 119 B.R. 566 (S.D.Ohio 1989) (district court holds that bankruptcy court, which had dismissed Chapter 11 case and instructed debtor's counsel to file a memorandum supporting his entitlement to $3,750 fee received from debtors, properly retained subject matter jurisdiction after dismissal to order counsel to return fee to debtors); *Matter of Mandalay Shores Co-op. Housing Ass'n*, 60 B.R. 22 (Bankr. M.D.Fla.1986) (dismissal of Chapter 11 case did not divest bankruptcy court of jurisdiction over professional fee application).

Admittedly, in both *In re Samford* and *Matter of Mandalay Shores Co-op. Housing Ass'n* the respective bankruptcy courts explicitly conditioned their dismissal orders to provide for the retention of jurisdiction. Here, the bankruptcy court's dismissal order did not explicitly provide for the retention of jurisdiction over the 506(c) Motion post-dismissal although it did note that the only objection to the dismissal was the Appellees' contention that the bankruptcy court should not dismiss the 506(c) Motion. (*See* Record, Ex. 7.) Moreover, this court notes that, by the time the underlying cases were dismissed on May 11, 1993, hearings had already been conducted on the 506(c) Motion,[15] the Preliminary Order regarding the 506(c) Motion had already been issued, and both Taylor's and SMR's applications as well as their briefs in support thereof and the Bank's briefs in opposition thereto had already been submitted. All that remained was for the bankruptcy court to render its decision on the 506(c)

Motion which it did in the form of the Final Order on June 18, 1993. In light of the fact that the vast majority of the proceedings relative to the 506(c) Motion occurred pre-dismissal, this court is loathe to conclude that the bankruptcy court lacked jurisdiction to render its decision on the 506(c) Motion post-dismissal. *See In re Franklin*, 802 F.2d 324 (9th Cir.1986) (bankruptcy court had subject matter jurisdiction, after dismissal of bankruptcy case, to construe and effectuate an order made prior to the dismissal).

Finally, the court notes that the bankruptcy court's retention of jurisdiction post-dismissal to resolve an issue involving the professional compensation of a bankruptcy-created trustee and his counsel has an analogy in a district court's authority to retain jurisdiction over a petition for attorney's fees post-dismissal. *See Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 889 F.2d 490, 495 (3d Cir.1989); *cf. Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (district court not deprived of jurisdiction to consider a Rule 11 motion despite its dismissal of the case in which the motion was filed). Accordingly, the bankruptcy court did not err when it retained jurisdiction over the 506(c) Motion following its dismissal of the underlying bankruptcy cases.

### III.

■ Both the Bank and the Appellees contend that the bankruptcy court erred by failing to make sufficient factual and/or legal findings to support the relief granted in the Final Order. For the reasons discussed below, the court agrees and will vacate the Final Order and remand the matter to the bankruptcy court for specific findings of fact and conclusions of law.

■ The Bank argues that the bankruptcy court improperly "based its Final Order on a settlement proposal and thereby left several important factual issues unresolved." (Appellant's Br. at 29.) Indeed, the Final Order notes that the Bank had unsuccessful-

---

**15.** Some hearings on the 506(c) Motion were conducted after the dismissal order was issued, (*see* Record, Exs. 17, 18), although at least one of those hearings apparently dealt mainly with the jurisdictional issue rather than the merits of the 506(c) Motion.

ly offered the Appellees a lien in the amount of $82,500 to be charged against the secured property of the Bank as settlement of their 506(c) claim. Apparently, this offer was a major, if perhaps not the sole, basis for the bankruptcy court's conclusion that an award of $82,500 was appropriate. (*See* Record, Ex. 2 at ¶ 2.) Evidence of settlement negotiations is not admissible to prove either liability for a claim or the amount of the claim. Fed.R.Evid. 408. Moreover, even apart from the issue of admissibility, reliance upon a settlement offer when fixing the amount of a party's liability is no substitute for factual findings. *See In re Tucker,* 989 F.2d 328, 330 (9th Cir.1993) (blanket statement or conclusion is no substitute for the specific findings of fact essential to resolve contested issues).

Here, the bankruptcy court, despite having previously ordered the Trustee and SMR to designate on their respective applications precisely which services they contended directly benefitted the Bank and/or were allegedly consented to by the Bank, nevertheless declined to specify which services formed the basis of the compensation allowed in the Final Order. While the amount awarded in the Final Order may perhaps in the wisdom of an experienced bankruptcy judge approximate a fair result within the circumstances of this case, there is simply not enough of a record for this court to properly review the bankruptcy court's decision. Indeed, as the Appellees point out, it is not even clear whether the compensation awarded represents a determination upon the Second Fee Application or is merely a partial award of the fees previously allowed pursuant to the First Fee Application. (*See* Appellees' Br. at 42.) Moreover, apart from the Final Order's command that Taylor not receive in excess of the amount to which he is entitled under 11 U.S.C. § 326(a), the bankruptcy court made no specific findings on the Trustee Application.

■■■ An order granting relief under § 506(c) must state the reasons supporting the order and cannot be so ambiguous that an appellate court cannot determine what facts the trial court relied upon. *See In re Trenge,* 127 B.R. 552, 558–59 (E.D.Pa.1991).

A failure to make the necessary factual findings will result in a remand to the bankruptcy court. *See In re Rheam of Indiana, Inc.,* 133 B.R. 325, 338 (E.D.Pa.1991). The court cannot determine the appropriateness of the amount awarded in the Final Order until it knows which services formed the basis of that award and the ground(s) upon which recovery for each of those services was allowed. Therefore, this court will remand the matter to the bankruptcy court. Upon remand, the bankruptcy court should examine all of the services for which SMR claims compensation in the First Fee Application and the Second Fee Application and specify both the services for which compensation is allowed and those for which it is denied as well as the reason(s)—i.e., benefit or consent or lack thereof—for the allowance or denial. Moreover, upon remand the bankruptcy court should also examine all of the services for which Taylor claims compensation in the Trustee Application and specify the amount of compensation, if any, to which Taylor is entitled under 11 U.S.C. § 326(a) as well as the basis and reasons for any such award. There remain, however, several issues which the parties have raised that the court will resolve at this juncture in order to hopefully provide some guidance to the bankruptcy court upon remand.

## IV.

■■■ The Bank contends that the standard employed by the bankruptcy court to determine liability under § 506(c)—the so-called "objective" and "subjective" tests—is incomplete and hence erroneous. The Appellees argue that the bankruptcy court erred when it rejected their contention that the Bank's Joinder in the Committee's Trustee Motion was tantamount to consent to all of the services reasonably performed by Taylor and SMR irrespective of any benefit to the Bank's secured property attained by those services. These contentions are discussed below.

Section 506(c) states:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property

to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). One court within this district has described the test for liability under § 506(c) as follows:

> In order for a secured creditor to be charged with expenses under section 506(c), a three-part test must be satisfied. It must be shown that (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses. *Matter of Trim–X, Inc.*, 695 F.2d 296, 299 (7th Cir.1982); *see also In re Trenge*, 127 B.R. 552, 555 (E.D.Pa.1991). Any recovery of costs is limited to the benefit conferred on the secured creditor....
>
> Whether expenses are reasonable, necessary, and have benefitted the secured party are factual issues that rest with the sound discretion of the trial judge. The party seeking recovery bears the burden of proof on those issues.

*In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 389 (E.D.Pa.1991) (some citations omitted). Another bankruptcy court within this district has offered a slightly different interpretation of the requirements for recovery under 506(c) which tracks the language of the statute:

> First, the costs and expenses must have been reasonable and necessary; second, the costs and expenses must have been incurred for the purposes of preserving or disposing of the secured property; and third, any recovery for costs and expenses is limited to the extent of the benefit of the holder of the secured claim.

*In re Birdsboro Casting Corp.*, 69 B.R. 955, 959 (Bankr.E.D.Pa.1987) (quoting *In re*

*AFCO Enterprises, Inc.*, 35 B.R. 512, 514 (Bankr.D.Utah 1983)).

The Bank contends that the bankruptcy court's objective test's exclusive focus on benefit ignores the requirement that the expenses be reasonable and necessary and, at least according to *In re Birdsboro Casting Corp.*, be related to preserving or disposing of the secured property. While the court agrees that the bankruptcy court never explicitly addressed and considered those requirements, it might fairly be argued that the concept of "benefit" embodied in the bankruptcy court's objective test implicitly incorporates those requirements. *See, e.g., Orfa V* at 798 ("actions of the Trustee and SMR which were directly dedicated to the preservation of the Property would seem to be compensable"); *id.* at 800 ("the Trustee's actions were reasonable"). Nevertheless, for the sake of clarity, upon remand the bankruptcy court should make specific findings regarding not only whether the costs and expenses incurred by the Appellees benefitted the Bank but also whether those costs and expenses were reasonable and necessary,[16] and related to preserving or disposing of the property.

The Bank also contends that the bankruptcy court's subjective test is erroneous because the Bank's alleged consent to the services performed by the Appellees is a proxy only for benefit and may not be employed as a substitute for the other two elements of the objective test. The court disagrees. A leading treatise has noted that:

> [Where] the holder of a secured claim has consented to the related preservation or disposition [of its collateral] ... the court may treat such consent as an advance acknowledgement that certain of the costs

---

16. The Appellees contend that the bankruptcy court's previous allowance of SMR's First Fee Request under 11 U.S.C. § 330 demonstrates that the bankruptcy court has already found the services covered by that request to be both reasonable and necessary. (Appellees' Br. at 35–36.) The court cannot agree. The standard for the allowance of fees under § 330 differs from the "reasonable" element of the test for liability under § 506(c):

> The reasonableness of the costs and expenses sought to be charged under section 506(c) is often measured against the benchmark of the amount of the costs and expense which would necessarily have been incurred by the holder of the secured claim in foreclosing on the property on its own behalf, particularly when such holder had not consented to the disposition by the debtor, debtor in possession or trustee.

3 Collier, ¶ 506.06 at 506–66 (15th ed. 1993) (footnote omitted). Accordingly, upon remand the bankruptcy court should evaluate the reasonableness of the Appellees' claimed costs and expenses within the specific contours of § 506(c)'s test for liability.

and expenses incurred would benefit such holder. Thus, when such consent has been given, the courts will allow a greater latitude with respect to allowance of costs and expenses.

3 Collier, ¶ 506.06 at 506–61 (15th ed. 1993) (footnote omitted).

While the above-quoted passage does indicate that services allegedly consented to must nevertheless be related to the preservation or disposition of the secured property, the "greater latitude" referred to indicates that where consent is found, a bankruptcy court need not be as rigorous in determining whether the costs and expenses claimed were reasonable and necessary. Indeed, it is the consent that renders them reasonable and necessary. Moreover, the court cannot help but note that in this instance the bankruptcy court refused to find an implied consent for all of the Appellees services flowing from the Bank's consent to Taylor's appointment, *see Orfa V* at 791, 799 and instead required a more specific, express showing of consent. *Id.* at 791, 797, 801. It would be an odd result indeed if the Bank were able to avoid liability for services related to the preservation or disposal of its collateral to which it specifically gave its consent on the ground that such services were not reasonable and necessary. Accordingly, upon remand, insofar as the bankruptcy court finds that the Bank specifically consented to services relating to the preservation or disposal of its collateral, it need not make specific findings as to whether such services were reasonable and necessary and may award compensation for those services under § 506(c) without a showing of benefit to the Bank.[17]

This brings the court to the Appellees' contention that the bankruptcy court erred when it rejected their argument that the Bank's Joinder in the Trustee Motion should be read as a blanket consent for all of the administrative expenses incurred by Taylor and SMR. (*See* Appellees' Br. at 21–32.) Simply put, this position lacks merit.

The bankruptcy court noted that the Bank and Taylor began to take adverse positions almost immediately following Taylor's appointment as the Chapter 11 Trustee, *see Orfa V* at 799,[18] and therefore refused to allow the Appellees to recover for "general administrative services during the periods of an adversarial relationship between [Taylor] and [the Bank]" or for "[a]ppearances at which [Taylor], either expressly or by clear implication, supported the Plan Proponents against [the Bank]." *Id.* at 800. Moreover, the bankruptcy court distinguished the cases that the Appellees principally relied upon for the position that the Bank's Joinder constituted an implied consent to all of the services performed by Taylor and SMR. *See Orfa V* at 800 ("[the] bottom-line results [of *In re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598 (Bankr.E.D.Va.1985), and *In re Hotel Associates, Inc.,* 6 B.R. 108 (Bankr.E.D.Pa.1980) ] are a far cry from allowing a trustee or his counsel to recover hundreds of thousands of dollars [for] services which were performed in direct opposition to the secured creditor's positions"). Accordingly, the bankruptcy court did not err when it concluded that "[a]n 'implied consent,' flowing from the mere act of supporting [Taylor's] appointment, appears to be too weak ... in itself to allow [Taylor] to prevail against [the Bank] under § 506(c)." *Orfa V* at 799.[19]

---

17. The bankruptcy court is, of course, not precluded from taking into account the reasonableness and necessity of services relating to the preservation or disposal of the Bank's collateral as probative of whether or not the Bank did indeed consent to such services. To be clear, however, the bankruptcy court need not find both that the Bank consented to such services and that such services were reasonable and necessary *in order to allow compensation under* § 506(c); a finding of consent is sufficient.

18. The Bank contends that any consent flowing from its Joinder in the Trustee Motion terminated on August 17, 1990 when it filed a praecipe

relisting its motion for relief from the automatic stay. (Appellant's Br. at 22–23; *see also Orfa V* at 792.) The effect of that action is for the bankruptcy court to ascertain upon remand in its determination of which services the Bank consented to and which services it did not.

19. While the Bank not surprisingly agrees with the bankruptcy court's conclusion that its Joinder in the Trustee Motion did not constitute an implied consent to all of the services performed by Taylor and SMR, it argues that the bankruptcy court erred by not further finding "that any implied consent was limited to the appointment of a *liquidating* trustee." (Appellant's Br. at 22.)

### V.

Finally, the court now turns its attention to several additional issues raised by the Bank on appeal. They are discussed in turn below.

### A.

The Bank contends that the bankruptcy court erred by failing to require Taylor and SMR to allocate their services among the three bankrupt estates (OrfaAm, OrfaDel, and OrfaPhil). According to the Bank, it cannot be charged with any services rendered with regard to OrfaAm or OrfaDel because such services could not benefit the Bank's interest as the secured creditor of OrfaPhil. (*See* Appellant's Br. at 42–44.) Of course, the Bank's argument is pure supposition at this point because it is impossible to discern whether any of the compensation allowed in the Final Order was in fact awarded for services rendered on behalf of OrfaAm or OrfaDel as opposed to OrfaPhil. Moreover, the court views this issue as merely a component of the Bank's larger contention that the services performed by Taylor and SMR did not benefit the Bank, (*See* Appellant's Br. at 24–28), for if the services rendered on behalf of OrfaAm and OrfaDel indeed provided no benefit to the Bank, then such services are not compensable under § 506(c). *See In re Birdsboro Casting Corp., supra,* 69 B.R. at 959 ("benefit to the lienholder is the ... 'linchpin in an award under § 506(c)' ") (citation and footnote omitted). Whether those services actually benefitted the Bank is a factual matter to be determined by the bankruptcy court upon remand.[20]

### B.

■ The Bank also argues that it cannot be liable under § 506(c) because the Debtors possessed unencumbered assets when Taylor was appointed Chapter 11 Trustee. (*See* Ap-

pellant's Br. at 44–47.) According to the Bank, "[a] critical factor for finding liability under § 506(c) is the secured creditor's knowledge at the time that the trustee was appointed that no other assets were available from which the trustee's fees and expenses could be paid." (*Id.* at 44.) This position is without merit for several reasons.

Firstly, the Bank's contention that it believed at the time of Taylor's appointment that sufficient unencumbered assets were available to pay any administrative expenses incurred by Taylor or SMR is undercut, if not directly contradicted, by the Bank's attempts, prior to Taylor's appointment, to limit its potential liability under § 506(c). (*See* Record, Ex. 29 at ¶¶ 13–14.) Moreover, the Bank's assertion that unencumbered assets did indeed exist is vigorously disputed by the Appellees. (*See* Appellees' Br. at 43–45.) Finally, and most pertinently, the Bank's argument that the existence of unencumbered assets bars recovery under § 506(c) is not supported by the two cases relied upon by the Bank.

### C.

■ The Bank further contends that the bankruptcy court erred as a matter of law to the extent that it directly imposed liability on the Bank because the liability of a secured creditor under § 506(c) is limited to a surcharge against its collateral or the proceeds therefrom. (*See* Appellant's Br. at 47.) On its face, the clear language of the statute supports this position. Section 506(c) allows a trustee to "recover *from property* securing an allowed secured claim." 11 U.S.C. § 506(c) (emphasis added). By contrast, it contains no provision for direct recovery from the secured creditor.

Moreover, the Appellees do not contend that the bankruptcy court had authority under § 506(c) to order the Bank to pay them

---

This contention is without merit. The Bank's Joinder in the Trustee Motion did not contain the word "liquidating." (*See* Record, Ex. 21.) Moreover, the Bank did not object when the bankruptcy court deleted the term "liquidating" from the proposed order granting the Trustee Motion, (*see* Record, Ex. 22; *Orfa V* at 792), and "never sought to attack or remove" Taylor. *Orfa V* at 793.

**20.** Of course, the Appellees might also be entitled to recover for services rendered on behalf of OrfaAm and OrfaDel if they can demonstrate, in accordance with the guidelines articulated by this court, that the Bank consented to those services.

directly as opposed to surcharging the Bank's collateral or the proceeds therefrom. Rather, they contend that the bankruptcy court had the authority to order the Bank to pay them directly by virtue of its general equitable powers pursuant to § 105(a). (*See* Appellees' Br. at 45–47.) This contention is flatly contradicted, however, by the bankruptcy court's clear refusal in the Preliminary Order to utilize its powers under § 105(a). *See Orfa V* at 797 ("This [506(c)] Motion will not be treated by the court as some sort of proceeding based on 11 U.S.C. § 105(a) to enforce equitable claims of [Taylor] against [the Bank]. [Taylor] has invoked only § 506(c)").

Finally, the Bank's position is supported by a leading treatise. *See* 3 Collier, ¶ 506.06 at 506–57 (15th ed. 1993) ("costs and expenses may be recovered under section 506(c) only from the proceeds of the property with respect to which they were expended"). Therefore, to the extent that the bankruptcy court directly imposed liability on the Bank in the Final Order, it was in error. Thus, upon remand, any compensation allowed the Appellees by the bankruptcy court under § 506(c) must be limited to either a surcharge against the Bank's secured property or the proceeds therefrom.

### D.

▮ Lastly, the Bank contends that the 506(c) Motion was improperly brought as a contested matter rather than an adversary proceeding and therefore should have been dismissed. (*See* Appellant's Br. at 48.) Bankruptcy Rule 7001 defines an adversary proceeding in part as "a proceeding to recover money or property." Fed.R.Bankr.P. 7001(1). The Bank claims that, because Taylor and SMR sought recourse against the Bank directly as opposed to a surcharge or charging lien against its collateral, the 506(c) Motion is a proceeding to recover money and therefore Taylor and SMR should have been required to proceed in the manner prescribed for an adversary proceeding. (*See* Appellant's Br. at 48.)

The Bank's position is not without significant support. *See* 9 Collier, ¶ 7001.04 at 7001–7 (15th ed. 1993) ("[p]roceedings within Rule 7001(1) include actions by trustees or debtors ... to recover under section 506(c) expenditures made in preserving or disposing of property subject to a lien"); *In re Blaisure*, 150 B.R. 343, 344 (Bankr.M.D.Pa. 1992) (motion seeking payment of an administrative claim brought pursuant to § 506(c) was an attempt to recover money required to be initiated as an adversary proceeding). Nevertheless, in some cases where a matter was improperly initiated by motion as a contested matter, "courts have concluded that where the rights of the affected parties have been adequately presented so that no prejudice has arisen, form will not be elevated over substance and the matter will be allowed to proceed on the merits as originally filed." *In re Command Services Corp.*, 102 B.R. 905, 908 (Bankr.N.D.N.Y.1989) (citing long string of cases).

In this instance, the Bank contends that the bankruptcy court's decision to allow the Appellees' § 506(c) claim to proceed as a contested matter deprived it of the ability to utilize Bankruptcy Rules 7012 and/or 7019 and Federal Rules of Civil Procedure 12 and/or 19 in order to either (1) seek to join the other parties that sought the trustee's appointment or (2) seek dismissal if it was unable to join any or all those parties. (*See* Appellant's Br. at 49.) The Bank contends that "the prejudice to the Bank from the failure to join these indispensable parties is the imposition on the Bank of a disproportionate responsibility for a liability which, in equity, should be borne at least in part by others [that joined in the motion seeking the appointment of the Trustee]." (*Id.* at 49–50.)

This contention is without merit. Section 506(c) permits recourse only against a secured creditor or its collateral. The Bank was apparently the Debtors' only secured creditor; the other parties which the Bank sought to join could not possibly have been liable to Taylor and SMR under § 506(c). *See Orfa V* at 797. The Bank's claim of prejudice resulting from the bankruptcy court's failure to require the matter to be brought as an adversary proceeding is therefore illusory. This is especially true in light of this court's determination that liability for the compensation sought by the Appellees

under § 506(c) may not be directly assessed against the Bank but rather must be limited to a surcharge against its secured property or the proceeds therefrom.

This court will not elevate form over substance: While the 506(c) Motion probably should have been instituted as an adversary proceeding rather than a contested matter, the Bank's claim of prejudice resulting therefrom is frivolous. Therefore, even if the bankruptcy court did perhaps err by allowing the 506(c) Motion to proceed as a contested matter rather than as an adversary proceeding, such an error was, in this case, harmless and does not warrant dismissal of the 506(c) Motion. *See In re Command Services Corp., supra.*

### VI.

For the foregoing reasons, the Final Order will be vacated and the matter remanded for further consideration consistent with this memorandum.