## JOHNSTON *against* SMITH.

Rent reserved upon a lease for a year, or a term of years, is incident to, and accompanies the reversion; unless they be separated by an express reservation. Thus the sale and conveyance of a farm, when in the possession of a tenant, who held the same upon the terms of yeilding to the landlord a certain proportion of the grain raised thereon, was held to vest in the purchaser the right to receive that proportion of the grain which was growing on the land, at the time of the conveyance to him, which the landlord would have been entitled to, if he had not conveyed.

Error to the Common Pleas of *Columbia* county.

This action was trover, brought by the defendant in error, to recover of the plaintiff, the value of a quantity of grain, consisting of wheat and rye. On the trial evidence was given, that *Chas. Clark*, had been the owner of a certain farm and tract of land; that he had let it to *Smith* the defendant in error, who had taken possession of it, lived upon it two or three years, and was to pay his rent, by a certain share of the grain raised by him upon the farm. That in March, 1828, *Clark* sold and conveyed the land to *Johnson*, while *Smith* was in the possession of it, as the tenant of *Clark*, under the terms mentioned. Upon the first of April following the conveyance of the reversion to *Johnson*, *Smith* quit the possession, and surrendered it to *Johnson*. At the harvest following, *Smith* cut the grain, divided it and put the landlord's share into a spring-house upon the farm. *Johnson*, as the purchaser of the reversion, conceiving himself entitled to the grain, which was the rent of the farm for that year, during which he had purchased, used it. *Clark*, his grantor, also claimed this rent from *Smith*, as coming to him: and *Smith*, that he might deliver the grain to *Clark*, came to take it away, but *Johnson* would not let him; and he then brought this action for the benefit of *Clark*. The counsel of *Johnson* on the trial of the cause requested the court below, among other things, to charge the jury, "that if *Smith* had a lease for a year and lived on the land, paying a certain portion of the grain for rent, that a sale of the land by the lessor, without reservation in the deed, would convey the rent to the vendee, if payable after the delivery of the deed."

The court below *(Chapman*, President,) delivered the following opinion to the jury:

On the facts, which are not disputed, three questions of law have been made.

1. That every thing growing on the ground, at the time of sale and delivery of the deed and possession of the land to the vendee, passed with the land to the vendee; but that all rent which was due and payable before the sale belongs to the vendor.

(Johnson *v.* Smith.)

3. It is contended by the counsel for the defendant, that *Michael Smith* the plaintiff cannot support this action, having delivered the grain agreeably to his lease in the barn, it belonged either to *James Johnson* or *Charles Clark*, and that it is necessary for the plaintiff to have either an actual or qualified property, to support an action of trover.

There has been a previous trial of this cause before this court; and on that trial, the court delivered their opinion in favor of the defendant. The cause was removed, and the Supreme Court reversed that opinion. On this trial, the cause has been more fully argued; and the counsel for the defendant contends, that the material questions were not brought before the Supreme Court; and that they have not adjudicated upon them. It does appear from the case reported, that *Charles Clark*, had leased the farm to *Michael Smith* for one year, which was to end on the 1st April, 1828: whereas by the evidence *Michael Smith* held the farm from year to year, and had lived upon it as tenant for two or three years; and in the decision of the cause, the Supreme Court take no notice of *Michael Smith's* delivering the grain in payment of his rent. Under these circumstances, it is out of no want of respect for the opinion of that court, but from the necessity of the case, and that it may come fully before that court, and that the important principles involved in this cause may be fully settled, that I have been induced to observe more fully upon the case, than otherwise would have been necessary. I had always considered that there was a marked distinction in the laws of *England*, as to where the grain in the ground would pass with land or would not pass. That the general rule is, wherever the estate is terminated by the act of the party, the grain in the ground passes with the land; but wherever the estate is terminated by the act of God, or by the act and operation of the law, the grain in the ground belongs to the former owner and passes to the executor or administrator of the deceased. The devisee will take the grain in the ground at the death of the devisor, because the devisee takes by purchase, and it was by the appointment of the devisor that he should take the estate, when he ceased to hold it: whereas when the heir at law takes the estate by act and operation of law, the grain in the ground passes to the administrator. If a man be tenant for the life of another and he, during whose life the land is held, dies after the grain is sown, the tenant takes the grain; the termination of the lease being by act of God. The husband and wife hold an estate during coverture, and the husband sows the land, and they are afterwards divorced from the bonds of matrimony, the husband shall have the grain in the ground, for the sentence of divorce is the act of the law; but if the estate is terminated by the tenant's own act, it is other-

(Johnson *v.* Smith.)

wise. If a tenant during widow-hood thinks proper to marry, she loses the grain in the ground; for the termination of the estate was by her own act. So if a husband make a feoffment in fee for the use of himself for life, and after to his wife, and he sow land and afterwards die, his executors or administrators shall have the grain in the ground. But if the feoffment be made to the use of the husband and wife together, in fee or for life, and the husband sow the land and die, in this case the wife, and not the executors or administrators shall have the grain in the ground. These distinctions do not appear altogether to arise from the circumstance of grain in the ground being a chattel interest arising from the land, but from a principle of justice that he who sows the grain, with a reasonable prospect of reaping it; and the estate is terminated, but not by his own act or consent, his executors or administrators shall have the grain, and also for the encouragement of agriculture. In *England*, a tenant for a certain number of years is not permitted to sow grain, which he cannot take away with him at the expiration of the lease. By a decision in this state, the tenant has the way-going crop. Why? Because a tenant renting for one year, the lease by consent of the parties, will continue from year to year. By the uncertainty of the termination of the lease, he is entitled to the grain in the ground. Another reason is given: The renting in *England*, is said to be in the fall, here in the spring of the year; and it would be manifestly unjust, that the tenant should pay a whole year's rent, without having a year's profit of the land. So that this case is decided upon the same principle of the *English* law. In *England*, land is not sold for the payment of debts. From a very early period in this state, land could be taken for the payment of debts under certain provisions. Before sale, it must be decided by an inquest, whether the rents, issues and profits would pay the debts, interest and cost, beyond all reprizes, within seven years, if so the land could not be sold, and the chattels and all other personal property must first be exhausted, before the sale of the land. Grain in the ground could be taken in execution; never having been considered part of the freehold; but a chattel interest arising out of it. When lands are sold by the Sheriff for payment of debts, they do not pass to the purchaser by the consent of the former owner, but by the act and operation of law; hence it follows, that grain in the ground belongs to the former owner, and may be taken in execution for the payment of other debts, whose executions have the first lien."

"It has been contended for the plaintiff, that by the custom of the country, the vendor reserved the right to take the grain which was growing upon the ground at the time of sale. I never heard of such a custom, before the trial of this cause; and I believe that such a custom or general usage never could or did exist. In many

if not in most cases; where a farmer sells the land upon which he resides, it is with the view of moving to a distance, where he can acquire more and better land for the same price, by which means his circumstances would be improved.    In these cases, he delivers his deed, receives his money, and the vendee takes the land with the grain in the ground.    I have known in a very few instances, where the vendor continued to reside in the neighborhood after the sale, a clause to be inserted in the article of agreement, that the vendor shall have the grain in the ground, leaving the straw upon the premises.    But these cases have been nothing like a general usage, which would create the law.

The second appears to this court, to be the important question in this cause.    *Michael Smith* was unquestionably the tenant of *Charles Clark*, holding the farm which he rented and resided upon from year to year, enjoying the whole of the profits thereof covenanting to pay to his landlord a certain portion of the grain which he raised upon the land, to be delivered in the bushel, at the barn, on the premises.    In this situation, the grain while growing upon the ground, was the property of *Michael Smith;* and if any person destroyed any part of it, he could maintain trespass against him.    By the *English* authorities, all rents due and payable pass with the land, and it makes no difference whether the land passes by devise, by descent or by alienation.    The right of the landlord to recover his rent when it becomes due, commences, with the lease, and delivery of possession of the land to the tenant. The rent in this case could not become due and payable, until there was a reasonable time for the tenant to harvest and thresh it, before that time the landlord could not demand his rent, or make a levy upon the grain for his rent.    A cropper is where an owner or occupant of land employs a person to cultivate a certain field or fields on the farm with grain, and as compensation to him for his labour, agrees to deliver to him a certain portion of the grain, when threshed, in the bushel.    In that case, the property of the grain remains in the owner or occupant of the land, who could support trespass against any one who destroys the grain.    That rent passes with the land which is not due, and payable at the termination of the estate.    It is stated in *Shephard's Touchstone,* if one seized of land in fee, makes a lease for years, ending at *Michaelmas,* and the lessor happen to die during the term, after *Michaelmas,* and before the ten days expired, in this case, the heir of the lessor, and not the executor or administrator, shall have the last half year's rent due at *Michaelmas.*.

"Whether there is any distinction made in this state, whether the rent is payable in *grain* or *money,* or whether the *English* law does, or does not extend here, as respects grain growing in the ground, at the termination of the estate, is not now for this court to, decide as we consider it as already decided, in this case."

(Johnson *v.* Smith.)

It remains to be considered, whether this action of trovercan be supported by *Michael Smith*. It may be, as has been contended, that *Smith* literally complied with his lease, by his depositing the landlord's share of the grain in the barn on the premises; but he did not substantially comply with his lease. We should have delivered the landlord's share to *Chas. Clark*, who, it is now decided, had the right to receive it. Until such delivery, at least a qualified property remained in *Smith*, sufficient to support an action of trover. I consider that the Supreme Court have decided this cause in favor of the plaintiff, and it would not be proper for this court to decide, that they did not take it fully into consideration. That is for the judges of that court to decide. We are bound by their decision, where the facts are not disputed; and your verdict should be for the plaintiff, at least for the value of the grain taken by the defendant."

This opinion was assigned for error.

*Grier*, for plaintiff in error, said, that this writ of error was sued out for the purpose of establishing the very plain principle, that rent was incident to, and was transferred for a conveyance of the reversion. To which point he cited 3 *Bac. Ab.* 63, *Title Exec's. Admr's.* and that the grain, the value of which was claimed in this action, was rent, he cited *Frey* v. *Jones,* 2 *Rawle,* 12. *Stewart* v. *Douty,* 9 *John. Rep.* 108.

*Frick*, for defendant in error, insisted, that the question now before the court, had been already decided and represented in *Smith* v. *Johnson,* 1 *Penn. Rep.* 471, and that grain in the ground was a chattel, and not subject to the same rules of law with regard to its transfer, which prevailed in *England.* Cited 2 *Rawle,* 171. 1 *Rawle,* 355.

The opinion of the court was delivered by

KENNEDY, J.—The charge of the court was certainly wrong. For no principle is better settled in the law, than that rent reserved upon a lease for a year or a term of years, which is the same thing, is incident to and accompanies the reversion; unless separated by an express reservation. Upon the death of the lessor, the reversion descends to his heirs, and they are entitled to demand and receive the rents which shall become payable afterwards. *Co. Lit.* 47 *a*, 143 *a.* 3 *Bac. Abr.* 62, 3. Fealty is said to be inseparable from the reversion; but rent may be excepted, because as *Lord Coke,* says, "although it be incident to the reversion, yet it is not inseparably incident. *Co. Lit.* 143 *a* Neither is it necessary, in order to make rent incident to the reversion, and transmissable with it to the heir, or to an *assignee of the reversion,* that it should be payable in money; for says Sir *Edward Coke,* "it may as well by in the delivery of hens, capons, roses, spurres, bowes, shafts,

(Johnson *v.* Smith.)

horses, hawkes, pepper, comine, *wheat,* or other profit that lieth in render, office, attendance, and such like, or in *payment of money. Co. Lit.* 142. *Fry* v. *Jones,* 2 *Rawle,* 11.

It has however, been contended here, by the counsel for the defendant in error, that under the terms and conditions, upon which he held the farm of *Clark,* that the land belonged to *Clark* at the time the grain was sown; and that as soon as the seed was committed to the ground it became the property of *Clark,* and must be considered his grain growing upon the land at the time he sold it to *Johnson;* and that according to the decision of this court, in the same cause in a former writ of error, *Penn. Rep.* 471, there being no express grant of the grain growing upon the land, contained in the deed of conveyance from *Clark* to *Johnson,* it must be considered as reserved by *Clark;* and that *Johnson* acquired no right to it: The premises from which this conclusion is drawn, cannot be sustained. Although *Clark* continued to be the owner of the land in fee after *Smith* took the possession of it under the assignment made with him for that purpose, yet by the terms of that agreement, he parted with his right to the possession of it, as the possession itself. He parted with his right and all claim to the products of the land while growing upon it during the continuance of *Smith's* interest in the possession and use of the same under his contract with *Clark,* as completely, as if he had let the farm to *Smith* for a money rent. *Clark,* therefore, had no right whatever to an interest in the grain sown by *Smith,* and growing upon the land at the time he sold and conveyed it to *Johnson.* Upon this principle it was very justly and correctly held by the Supreme Court of *New York* in *Stewart* v. *Daughty,* 9 *Johns. Rep.* 108, that the purchaser at a Sheriff's sale of the crop of grain growing upon the land which the defendant in the execution, as whose property it was taken and sold, held at the time of sowing the crop under a lease for years, upon which he was to pay one half of all the grain raised by him on the farm in each year as his rent, delivered in the bushel, and which lease had been terminated by the lease, before the grain had ripened and was cut, was entitled to the whole of the crop; and that the landlord had no interest in it until it was separated from the ground, and his proportion of it delivered to him in conformity to the terms of the lease. And it was also held in this case, that the purchaser of the crop at the Sheriff's sale, might maintain trespass *quare clausum fregit* against the landlord himself who had expelled the plaintiff from the ground upon which the crop grew at the time he was cutting it.

The court below seemed to have misapprehended the point or question, upon which the opinion of this court was pronounced upon a former writ of error. 1 *Penn. Rep.* 471 and not altogeth-

(Johnson *v.* Smith.)

or without some reason: for in the report of the cause, the case as there stated, presents the same question which is now raised; but the opinion of the court presents an entirely different one; that is, whether a sale, conveyance and delivery of the possession of land, passed with it a right also to the crop of grain growing on the land at the time of the grant or conveyance, which belonged to the grantor? This was the question which was then resolved by this court; and not that of whether a grant of the reversion carried with it a right to demand and receive the future accruing rents?

Judgment reversed and a *venire de novo* awarded.