**In re MALL AT ONE ASSOCIATES, L.P., Debtor.**

**Bankruptcy No. 93–15504DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 12, 1995.

David C. Shuter, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for debtor.

Douglas N. Candeub, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Mall at One Group, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Stewart Paley, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Bank of New York—National Community Division.

Ivan J. Krouk, Lincoln Rittenhouse, Philadelphia, PA, for RK Mall Corp.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently to be decided in this contentious bankruptcy case is the issue of how to distribute the assets of the Debtor subsequent to an auction sale of its primary real estate asset. Two questions having some general application arise, namely (1) what is the nature of a recovery under 11 U.S.C. § 506(c) and where does such as recovery fall in a distribution scheme? and (2) what are the rights of a mortgagee against a debtor or the purchaser after an auction sale of the debtor's assets under a confirmed plan?

We answer the first question by concluding, under federal bankruptcy law, that a § 506(c) claim is a secured claim of the high-

est priority, entitled to distribution even prior to the secured claim which the services performed which support the § 506(c) recovery have been found to preserve. Therefore, a cap on "administrative claims" does not restrict such a recovery except to the extent that a double recovery is prevented. We answer the second question by concluding, under applicable Pennsylvania state law, that, upon the auction sale of the property, the purchaser became the equitable owner of the property, entitled to all of the rents generated thereby, but liable for making payments under the terms of an assumed mortgage. We also decide, in an issue of narrow application to interpretation of the instant plan, that seventh-priority municipal real estate tax claims, although erroneously classified in a confirmed plan as "secured claims," have priority over the unsecured deficiency claim of the second, undersecured mortgagee of the property, which was also the auction-sale purchaser.

## B. PROCEDURAL AND FACTUAL HISTORY

The instant voluntary Chapter 11 bankruptcy case was filed by MALL AT ONE ASSOCIATES, L.P. ("the Debtor"), on September 20, 1993. The Debtor's only business was the ownership and operation of a shopping mall located at Roosevelt Boulevard (U.S. Route 1; hence the property is a "Mall-at-One") and Grant Avenue in Philadelphia, Pennsylvania ("the Mall").

As we pointed out in two previous Opinions arising out of this case which are to be published in the Bankruptcy Reporter at 185 B.R. 1009 (Bankr.E.D.Pa.1995) (fixing the amount and classifications of certain tax claims of the City of Philadelphia ("the City") against the Debtor) ("*Opinion III*"); and 185 B.R. 981 (Bankr.E.D.Pa.1995) (allowing a small ($10,840.50) 11 U.S.C. § 506(c) recovery to the Debtor's counsel) ("*Opinion II*"); and a decision reported only as 1995 WL 318851, slip op. at *2 (Bankr.E.D.Pa. May 23, 1995) (denial of a motion by a frustrated prospective pre-confirmation purchaser to preliminarily enjoin the auction sale of the Mall pursuant to the Debtor's confirmed plan) ("*Opinion I*"), this case has become

very contentious due to the failure of the Debtor's confirmed plan to achieve its purpose of establishing the terms for a pre-confirmation negotiated private sale of the Mall.

As we explained in *Opinion III*, 185 B.R. at 1011–12; *Opinion II*, 185 B.R. at 984; and *Opinion I*, slip op. at *2–*3, the Debtor had four substantial pre-petition secured creditors: (1) the Bank of New York–National Community Division ("BNY"), having a fully secured first mortgage claim in the amount of approximately $4.3 million, in light of the estimated value of the Mall of $7 million, which was in fact realized by it at the auction sale; (2) Mall at One Group, L.P. ("Group," with BNY, "the Creditors"), whose asserted secured second mortgage claim of approximately $5.5 million was obviously undersecured; (3) ING Vastgoed One B.V. ("Vastgoed"), a Netherlands corporation holding a third mortgage on the Mall in excess of $3.8 million, which gracefully agreed to receive nothing under the Plan; and (4) the City, which was allowed, in *Opinion III*, 185 B.R. at 1023–24, as a first priority, a real estate tax claim of $145,588.84 and business use and occupancy ("BU & O") tax claims of $43,-307.67; and, as a seventh priority, a real estate tax claim of $137,344.50 and BU & O tax claims of $27,640.85.

After filing a series of unconfirmed plans, the earliest versions of which featured subsequently-withdrawn funding proposals by Vastgoed, the Debtor filed the ultimately-confirmed Plan on December 2, 1994. The Plan, supported and apparently partially drafted by Group, but opposed by BNY, which appealed from the confirmation Order of January 17, 1995, provided for a sale of the Mall to a private party, New Plan Realty Trust ("New Plan"), for a price of not less than $7 million and further provided that, in the event that this sale did not occur, the Mall was to go to auction.

The sale to New Plan unfortunately fell through, apparently due to the inability of New Plan to reach a negotiated figure for the total payments due to BNY and/or Group. The Debtor attempted to forestall the auction sale with a last-minute motion to modify the Plan to permit a private sale of the Mall

to Delancey Investment Group, Inc. ("Delancey") for $7,125,000. The Creditors opposed this Motion, and it was denied on April 10, 1995. Group credit bid $7 million at the auction of April 11, 1995, and Delancey, allegedly faced with less favorable sale conditions than in the private sale transaction proposed earlier to the Debtor, made a cash bid of only $6 million at the auction. Delancey's efforts to invalidate the sale to Group, joined by the Debtor, were rebuffed in *Opinion I.*

In *Opinion II,* 185 B.R. at 985, we attributed the Debtor's filing of § 506(c) claims seeking over $1.85 million in expenses and costs against both BNY and Group largely to "rancor among the parties." The § 506(c) claim was allowed in the modest amount of $10,840.50.

In *Opinion III,* in addition to fixing the City's claims as indicated, we held that the City's claims for 1988–89 taxes which predated the Debtor's ownership of the Mall, as well as the 1995 taxes arising post-confirmation, should be attributed, if collectible, to Group, which sold the Mall to the Debtor on April 13, 1990, as well as repurchasing it on April 11, 1995. 185 B.R. at 1016–17, 1020. That aspect of *Opinion III* suggesting that Group was liable for the 1988–89 and 1995 taxes possibly prompted Group to seek reconsideration of certain passages of that Opinion, but apparently not reconsideration of the accompanying Order. The reconsideration motion is listed for a hearing on October 18, 1995.

On September 15, 1995, the instant Joint Motion of the Creditors for an Order Directing Debtor's Distribution of Funds ("the Motion") was filed and scheduled, per the Movants' request, for an expedited hearing on September 27, 1995. The Motion requested that the Debtor's funds be distributed as follows: (1) to BNY in the amount of $199,-807.70 for mortgage payments for the period from May 1, 1995, to August 1, 1995, plus all amounts due on the BNY mortgage from September 1, 1995, through the date of closing on the sale of the Mall to Group; (2) to the Debtor's counsel in the amount of $10,-840.50 on account of its allowed § 506(c)

claim out of estate assets which would otherwise be payable to Group; (3) to the extent of available additional funds, to administrative expense claims allowed under §§ 503(b) and 507(a)(1) of the Bankruptcy Code, including, and on a pro rata basis, if not payable in full: (a) the Philadelphia Authority for Industrial Development ("PAID"), in the amount of $2,940.00 for the period from April 1995 through September 1995, plus any amounts due PAID after September 1995 (at $490.00 per month) through the date of closing on the sale of the Debtor's property; (b) Traiman Corporation, for auctioneer's fees in the allowed amount of $29,920.00; (c) fees due to the United States Trustee; (d) claims of the City of Philadelphia in the combined amount of $188,896.51, as allowed by this court as administrative expenses; and (e) fees and costs due to the Debtor's counsel in the allowed amounts of *$79,159.50* as to fees, being the allowed amount of $90,000.00 *less* the $10,840.50 allowed as a § 506(c) claim against Group, and $11,116.30 in costs; and (4) to the extent of any remaining funds or assets, to Group, upon the balance of its entire, allegedly secured claim, which sum would clearly exhaust all funds available.

The Debtor, the City, and RK Mall Corporation, the Debtor's general partner ("RK") all opposed the propositions that BNY should receive a first-priority secured claim for post-sale mortgage payments and that Group's deficiency claim should be hoisted above the City's seventh-priority tax claims.[1] The Debtor's counsel also opposed the effort to effectively wipe out its § 506(c) claim by including it within a $90,000 administrative claim cap to which the counsel agreed under the terms of the Plan. At the close of a lengthy oral argument on the Motion on September 27, 1995, this court requested the parties to file statements indicating how they believed that the Debtor's assets should be distributed and why on or before October 6, 1995. The Creditors, the Debtor, the City, and RK all offered timely remittances.

In their post-hearing submission, though without waiving their contention that their original contentions were incorrect, the Cred-

---

1. In fact, even as amended, the Creditors initial proposed order of distribution makes no provi-

sion whatsoever for the City's seventh-priority claims.

itors offered a proposed distribution voluntarily placing distribution of the City's seventh-priority claim above Group's deficiency claim. Also noteworthy is RK's submission of an account of the following funds owned by the Debtor: (1) approximately $280,000 held in a tax escrow account; (2) another approximately $280,000 deposited in general debtor-in-possession accounts; (3) $225,000 of rents collected in August, September, and October 1995; and (4) $81,615.00 escrowed by a tenant of the Mall, Toys "R" Us ("Toys"). Although RK states that the Toys' escrow includes payments back to April 1995, a copy of a letter from Toys' counsel to the Debtor's agent, attached to the Debtor's submission, indicates that all of the amounts held by Toys arose subsequent to April 11, 1995, except perhaps a portion of $1,674.55 representing Toys' April 1995 BU & O tax remittance to the Debtor.

## C. DISCUSSION

### 1. THE § 506(c) RECOVERY BY THE DEBTOR'S COUNSEL IS NOT SUBJECT TO THE PLAN'S $90,000 CAP ON "ADMINISTRATIVE CLAIMS" OF THE DEBTOR'S COUNSEL.

Section 506(c) of the Bankruptcy Code provides that a claimant's recovery under that Code section is "from property securing an allowed secured claim." In the Plan, discussing the treatment of "Class 1 (Administrative Claims)," "[t]he Debtor's counsel agrees that it will not seek to collect in excess of $90,000" in addition to a $24,000 retainer, plus allowed costs and expenses. Fees and costs in the total amounts of $129,543.10 and $11,116.27, respectively, were awarded to the Debtor's counsel by this court for services through

May 31, 1995. *See Opinion II*, 185 B.R. at 987. If it were not for this cap, counsel obviously would have sought additional compensation for the substantial services rendered after May 31, 1995.[2]

■ As the Movants apparently recognize in assigning the § 506(c) claim priority second to only the amount claimed by BNY, a § 506(c) claim is not an administrative claim, but an assessment against a secured claim which takes precedence over even the secured claim against which the recovery is charged. *See, e.g., In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 274–75 (E.D.Pa.1994) ("*Orfa II* "); and *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 388 (E.D.Pa.1991).[3] Practically, it makes sense for a debtor or its professionals to prosecute a § 506(c) claim only where that claim would not otherwise be payable as an administrative claim from estate assets, because administrative·claims are guaranteed full payment under the terms of any confirmed plan unless the claimant waives its right to same. *See* 11 U.S.C. § 1129(a)(4).

■ It is therefore clear to us that the § 506(c) recovery awarded to the Debtor's counsel in *Opinion II*, be it ever so humble in amount, is entitled to a higher priority than "mere" "administrative claims." It is only the latter to which counsel has agreed to a $90,000 cap.

■ While apparently recognizing that a § 506(c) claim is entitled to a higher priority than an administrative claim, the Creditors nevertheless assert that a reduction of counsel's § 506(c) allowance from the $90,000 fee cap is warranted because § 506(c) is not intended to allow the claimant a "double re-

2. In their post-hearing submissions, the Debtor and the City indicate that the Debtor is due $18,638.26 in costs. Apparently, this figure represents an attempt to append costs accruing after May 31, 1995. We note, however, that costs not approved by this court cannot be added to the distribution due to the Debtor's counsel, and only $11,116.27 has been so approved.

3. To the extent that our statement in *Opinion II*, 185 B.R. at 990, indicating that the § 506(c) recovery by the Debtor's counsel "would be payable in their [sic] capacity as an administrative creditor" appears to state to the contrary, that

statement was in error. Therein, we were attempting to distinguish between certain claims of the Debtor under § 506(c) representing expenses otherwise payable to the Creditors under the cash collateral stipulations and therefore not within the scope of § 506(c), and claims of the Debtor's counsel allowable under § 506(c). We reiterate that these fees are not within the scope of charges otherwise payable by the Debtor to Group under the cash collateral stipulations, but we now believe that we erred to the extent that we characterized the § 506(c) claims of counsel as, in any sense, "administrative claims."

covery," citing *In re Dinsmore Tire Center, Inc.*, 81 B.R. 136, 138 (Bankr.S.D.Fla.1987). We agree that § 506(c) cannot be utilized to allow any person to obtain a "double recovery," *i.e.*, a § 506(c) claim in addition to an administrative claim payable for the same services. We also agree that the 11 U.S.C. § 326(a) statutory cap on a trustee's commission, which is at issue in *Dinsmore Tire*, cannot be circumvented by a § 506(c) recovery. *Cf. In re Orfa Corp. of Philadelphia*, 149 B.R. 790, 797 (Bankr.E.D.Pa.1993), *aff'd in part & remanded in part, Orfa II, supra* (a trustee may not be entitled to any recovery even if the trustee's counsel is found to have benefitted the secured creditor if the trustee is also found not entitled to same under § 326(a)).

■ However, neither of those principles are at issue here. The Debtor's counsel has already been awarded fees in excess of the sum of the cap of $90,000 plus the $24,000 retainer *and* the $10,840.50 § 506(c) recovery. Therefore, no cap, be it statutory or Plan-provided, is circumvented by permitting the Debtor's counsel to receive the $10,840.50 recovery plus the $90,000 cap on an administrative claim for services performed in this case by the said counsel. Consequently, the § 506(c) recovery of the Debtor's counsel is allowable as a first priority without having any affect on the $90,000 administrative claim of the Debtor's counsel.

2. *THE DEBTOR IS NOT LIABLE TO BNY FOR POST–AUCTION–SALE MORTGAGE PAYMENTS, AL-THOUGH WE ALSO NOTE THAT THE DEBTOR IS NOT AUTHO-RIZED TO RETAIN POST–SALE RENT PAYMENTS.*

■ The Movants contend that Plan provisions (1) allowing BNY to "retain its legal, equitable and contractual rights against the [Mall];" and (2) stating that Plan implementation is generated from "Net Cash Flow from Operations prior to the Effective Date of the Plan," support the extension of BNY's claim based upon its oversecured first mortgage to post-auction-sale mortgage payments totaling $199,807.70. The Debtor, in reply, argues, first, that, upon confirmation, 11 U.S.C. § 1141(c) divests liens not expressly preserved and that the Plan does not expressly authorize post-sale payments to BNY, thus divesting BNY's liens against everything owned by the Debtor except the Mall itself. Secondly, it contends that, since Group assumed BNY's mortgage obligations in its credit bid at the auction sale, only the mortgage interest payments, if anything, should be payable to BNY.

We agree with the Creditors to the extent that they argue that confirmation of the Debtor's Plan did not divest any aspect of BNY's lien. As we read the Plan, it preserves *all* of BNY's liens enforceable under applicable state law after confirmation. However, we also find that, upon the auction sale of the Mall to Group on April 11, 1995, the Pennsylvania state law rights of BNY to charge the Debtor for the mortgage payments were cut off.

At that point, applicable state law provides that, when a party

> executed an executory contract for the sale of lands, ... equity looks upon things agreed to be done, as actually performed; consequently, when an agreement is made for the sale of an estate, the vendor is considered as a trustee for the purchaser, of the estate sold, and the purchaser as a trustee of the purchase money for the vendor: [citations omitted]. The vendee is, in contemplation of equity, actually seized of the estate, ...

*Kerr v. Day*, 14 Pa. 112, 114 (1850). *Accord, Wood v. Evanitzsky*, 369 Pa. 123, 129, 85 A.2d 24, 27 (1951); 77 AM.JUR.2d 477–78 (1975); and 32 P.L.E. 355 (1960). Thus, upon the completion of the auction sale, Group became the equitable owner of the Mall, liable to BNY on the first mortgage obligation of the Debtor to BNY which it assumed. This conclusion is consistent with the similar conclusions reached by us in *Opinion III*, where we found, 185 B.R. at 1016, 1020, that Group became the equitable owner of the Mall on April 11, 1995, and became subject to tax liabilities arising thereafter. *Cf.* 32 P.L.E., *supra*, at 362–64 (equitable ownership determines ownership of real property for purposes of the incidence of taxes on that property).

Concomitantly, we must observe that the right to collect rents also follows equitable ownership of the Mall. *See Johnson v. Smith,* 3 Pen. & W. 496, 500 (Pa.1832); and *Sladkin v. Greene,* 359 Pa. 528, 530, 59 A.2d 105, 107 (1948). Therefore, the implicit contention of the Debtor and RK that the rents collected post-sale, which includes almost all, if not all, of the Toys escrow, belong to the Debtor, is in error. In fact, these rents belong to Group, as the equitable owner of the Mall, after the sale. The attempts of the Debtor and RK to address the inequity of the Debtor's retention of post-sale rents, while denying the Debtor's liability for post-sale mortgage payments, by paying BNY its post-sale interest payments are hence unwarranted and unnecessary. The party liable to pay the mortgage should also be entitled to collection of the rents necessary to pay the mortgage and vice versa.

Sorting out the rights of BNY to the rents vis-a-vis the Mall's owner is therefore an issue between BNY and Group which we need not address. It is proper that we relegate the resolution of this question to a non-bankruptcy forum, since it is a dispute between creditors, the resolution of which is irrelevant to the administration of the Debtor's estate and the implementation of the Plan. The disposition of this issue is thus similar to our relegation of the remaining disputes between Group and the City regarding the Debtor's 1988–89 and 1995 tax liabilities to other forums. *Compare Opinion III,* 185 B.R. at 1016–17, 1020.

With the corollary that the post-sale rents collected by the Debtor, as reported by RK, are not the Debtor's property to keep, we will strike BNY's claim for post-sale mortgage payments from the Debtor.

### 3. *THE PLAN DOES NOT PROVIDE A PRIORITY OF PAYMENT OF THE DEFICIENCY CLAIM OF GROUP OVER THE SEVENTH–PRIORITY CLAIMS OF THE CITY.*

In light of Group's gratuitous agreement that the City's allowed seventh-priority claims, as well as its allowed first-priority administrative claims, may be paid prior to its own unsecured deficiency claim, the issue of the priority of Group's deficiency claim over those of the City's real estate tax claims under the terms of the Plan need not be addressed at length. However, since the Creditors assert that Group does not waive the contention that it would otherwise have such a priority, we deem it advisable to address this subject to some degree.

Group's contention regarding its priority over the City's seventh-priority claims is based on its interpretation of the treatment of "Class 5 (Secured claim of Group)" relative to that of the "Class 3 (Secured claim of City)." Group does not dispute that the Plan expressly designates Class 3 claims of the City as prior to its Class 5 claims. However, this court, in *Opinion III,* determined that the City did not have any valid secured claims against the Debtor. *See* 185 B.R. at 1018. Therefore, argues Group, the City's real estate tax claims do not fit within Class 3 "secured claims" and the City has accordingly lost this priority.

However, it is clear that, in *Opinion III,* this court interpreted Class 3 as applicable to the City's real estate tax claims, irrespective of whether these claims were deemed to be secured or not. *See id.* at 1012–13, 1021–22. This is not surprising, because there is no other class established by the Plan into which the City's real estate tax claims could reasonably be fit. Notably, we limited the City's entitlement to interest accruing on or before August 15, 1994, in conformity with the statements relating to treatment of the City's Class 3 claims in that respect. *Id.* at 1022.

There has been no appeal of the Order accompanying *Opinion III,* which treats the City's real estate tax claims as Class 3 claims. Although Group moved for reconsideration of certain portions of *Opinion III,* it apparently did not request that we reconsider the Order accompanying *Opinion III.* Specifically, nowhere in the motion for reconsideration did Group raise the treatment of the City's claims for real estate taxes as Class 3 claims as an issue for us to reconsider. Therefore, all interested parties, including the Creditors, appear to be collaterally estopped from relitigating the treatment of

the City's real estate tax claims as Class 3 claims.

The treatment of the Class 5 claim provides that Group is to be paid $2,401,166 on account of its entire secured claim on the effective date, which is, at the latest, the date of the sale. However, the Plan also provides that, as to Class 5 claims, in the event of an auction sale, after payment of BNY's claim "and the City is paid upon its Class 3 claim," Group is to be paid the next $2,550,000 of proceeds, less $50,000 contributed by it in payment of certain tax claims. Then, after payment of $90,000 for administrative claims, Group is to be paid the balance of its claim to the full extent of its claim, said to be "approximately" $5,463,177.

The treatment of Group's claim must be modified to accommodate the unanticipated but attained contingency of Group's successful credit bid at the auction sale, as well as Group's subsequent agreement with BNY for the assumption of BNY's mortgage. Group "used" its secured claim in making its credit bid of $7 million. The payment due to BNY must be resolved between BNY and Group, subject to the terms of the assumption of .BNY's mortgage by Group. As a result, BNY will not be paid the proceeds of the sale, but will be paid by Group in accordance with its rights under the mortgage or the agreement of these parties. There is no reason to conclude, as Group urges, that the City loses the priority of its Class 3 payment as a result of our decision that its real estate tax claims are not secured. Our decision regarding the treatment of the City's real estate tax claims as Class 3 claims in *Opinion III*, 185 B.R. at 1012–13, 1021–22, constitutes an expression that the treatment of these tax claims under the Plan is not affected by our finding, in that same *Opinion III*, *id.* at 1018, regarding the secured status of those claims.

Therefore, we conclude that the City retains the priority of payment of its real estate tax claims over any payments to Group. We note that this disposition is consistent with the terms of the tax escrow under which approximately $280,000, or about half, of the Debtor's assets, have been deposited, strictly for the City's benefit. We further note that

the total of the City's claims exceeds the escrow, making it appropriate, under the likely terms of the escrow, that the City receive at least the amount in this account before any distribution is made to other creditors.

For all these reasons, we conclude that the City is entitled to payment of all its allowed claims prior to any payments to Group, whether Group agrees to this disposition or not.

We do note, however, that the provisions of the Plan relating to treatment of Class 5 claims do appear to provide Group's deficiency claim with a priority over all other claims, most notably the classes of both "small" and "general" unsecured creditors. Therefore, the proposals by the Debtor and the City suggesting that Group's deficiency claim is relegated to a pro rata share with all other unsecured claims is not well-taken. All of the remaining funds will obviously be exhausted by Group's deficiency claim, with no prospect of a distribution to "small" or "general" unsecured creditors.

### D. CONCLUSION

A distribution Order which we believe is consistent with the conclusions reached in the foregoing Opinion is attached.

### ORDER

AND NOW, this 12th day of October, 1995, after hearing extended oral argument in relation to the Joint Motion of Bank of New York–National Community Division ("BNY") and Mall at One Group, L.P. ("Group") for an Order Directing Debtor's Distribution of Funds on September 27, 1995, and upon receipt of statements from several interested parties indicating how they believe that the Debtor's assets should be distributed and why, it is hereby ORDERED AND DECREED as follows:

1. The following distribution of the Debtor's assets, which we find includes only those sums in the BNY tax escrow account and in the Debtor-in-possession account, shall be made:

First, the allowed 11 U.S.C. § 506(c) surcharge to Group's security interest in the

Debtor's real property allowed to the Debtor, per its counsel, in the amount of $10,840.50.

Second, the allowed administrative claims against the Debtor, as follows:

a. The Debtor's allowed counsel fees and costs exceeding its $24,000 retainer totaling $101,116.27 ($90,000 in fees and $11,116.27 in costs);

b. the allowed claim of Traiman Corporation, auctioneer, in the amount of $29,200.00;

c. the total of the allowed claims of the City of Philadelphia ("the City"), pursuant to 11 U.S.C. § 507(a)(1), in the amount of $188,896.51;

d. the uncontested Philadelphia Agency for Industrial Development claim in the amount of $2,940.00;

Third, the total of the allowed claims of the City, pursuant to 11 U.S.C. § 507(a)(7), in the amount of $164,949.35;

Fourth, the balance to Group, on account of its uncontested unsecured deficiency claim.

2. All claims of BNY for mortgage payments due from the Debtor falling due subsequent to April 11, 1995, are DENIED, because such payments are due from Group and not from the Debtor.

3. All rents collected from any tenants of the real property in issue falling due subsequent to April 11, 1995, including the funds in the Toys–"R"–Us escrow account, are DECLARED to be the property of Group, subject to whatever rights BNY has in same under applicable Pennsylvania state law.